1
2
3
4
5
6
7
8             **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   ELIZABETH BLUHM and EVAN BECKER,          CASE NO. 11cv313-GPC(RBB)

12                               Plaintiffs,   **ORDER GRANTING IN PART**
                                               **AND DENYING IN PART**
13        vs.                                  **DEFENDANTS' MOTION FOR**
                                               **SUMMARY JUDGMENT**
14   PNC FINANCIAL SERVICES GROUP,
     INC; RED CAPITAL GROUP, LLC; RED
15   CAPITAL MARKETS, LLC; THE                 [Dkt. No. 35.]
     NATIONAL CITY CORPORATION
16   MANAGEMENT SEVERANCE PLAN, as
     effective January 1, 2005; THE NATIONAL
17   CITY CORPORATION MANAGEMENT
     SEVERAL PLAN, as effective September 30,
18   2008; and THE RED CAPITAL GROUP
     MANAGEMENT SEVERANCE PLAN, as
19   effective July 1, 2008,

20                               Defendants.

21

22        Before the Court is Defendants' motion for summary judgment as to all claims in the

23   Complaint.  Plaintiffs filed an opposition on May 7, 2012.  (Dkt. No. 44.)  On May 14, 2012,

24   Defendants filed a reply.  (Dkt. No. 45.)  On May 17, 2012, the matter was taken under submission.

25   (Dkt. No. 46.)  On October 4, 2012, the case was transferred to the undersigned judge.  (Dkt. No. 49.)

26   Based on the review of the papers, supporting documentation, and applicable law, the Court GRANTS

27   in part and DENIES in part Defendants' motion for summary judgment.

28   / / / /

**Background**

On February 15, 2011, Plaintiffs Elizabeth Bluhm and Evan Becker filed a Complaint in this Court challenging the denial of severance benefits under the four different plans.  (Dkt. No. 1.) Plaintiffs assert three causes of action: 1) breach of contract based on the Interim Agreement; 2) denial of severance benefits under one of three severance plans pursuant to ERISA; and 3) retaliation pursuant to 29 U.S.C. § 1140.  First, Plaintiff alleges there was an oral "Interim Agreement" that provided severance benefits that is not subject to ERISA but is a breach of contract claim under state law.  Alternatively, Plaintiffs seek claims under three management severance plans under ERISA as to:

1.   National City Corporation Management Severance Plan as effective January 1, 2005 (the "2005 Plan");

2.   National City Corporation Management Severance Plan as effective September 30, 2008 (the "2008 Plan");

3.   Red Capital Group Management Severance Plan as effective July 1, 2008 (the "Red Capital Plan").

**Factual Background**

The following facts are undisputed.  Plaintiffs Elizabeth Bluhm and Evan Becker worked for Red Capital Markets, LLC, a national banking business and one of four operating entities that are now collectively known as Red Capital Group, LLC ("Red Capital"). (Dkt. No. 1, Compl. ¶ 4.)  Plaintiff Bluhm was the founding head of Red Capital's Tax Credit Group in 1993-94.  (Dkt. No. 35-3, Ferguson Decl., Ex. 10 at 65[1].)   Bluhm opened the firm's San Diego office in 2001.  (Id. at 65.)  She was directly responsible for all aspects of sales and marketing of the firms' tax credit product.  (Id.) Plaintiff Becker joined Red Capital in 2001 as Western Director of Originations. (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 127.)

Red Capital was sold and bought over the years.  More recently, in 2004, National City Corporation ("National City") acquired Provident Bank which included the acquisition of Red Capital

---

[1]The page numbers are based on the numbers on the parties' documents, not CM/ECF pagination.

as a subsidiary.  (Dkt. No. 1, Compl. ¶ 5.)  On December 31, 2008, PNC Financial Services Group, Inc. ("PNC") acquired National City, which included Red Capital as a subsidiary.  (Id.)  Effective May 7, 2010, PNC separately sold Red Capital to an investment group led by ORIX.  (Dkt. No. 35-5, Ferguson Decl., Ex. 16.)

On March 16, 2010, Plaintiffs and a few others, pursuant to the provision in all the written Plans, sent a letter to Defendants concerning a notice of determination of a change in circumstances following a change in control which would entitle them to severance benefits.  (Dkt. No. 35-3, Ferguson Decl., Exs. 4 & 5.)  The letters indicated their intent to make severance claims under all the Plans with written notice giving a 10 day opportunity for Defendants to remedy their loss of pay and/or job duties.  (Dkt. No. 35-3, Ferguson Decl., Ex. 4 at 51; Ex. 5 at 54.)

When Plaintiffs received no responses to their March 16, 2010 letters, they submitted conditional written resignations on March 31, 2010, the last day of the "Protection Period."  (Dkt. No. 35-3, Ferguson Decl., Ex. 8 at 60; Ex. 9 at 62.)  Plaintiffs indicated they would resign effective March 31, 2010 if PNC determined that they would be eligible for severance benefits as indicated in their March 16, 2010 letter.  (Dkt. No. 35-3, Ferguson Decl., Ex. 8 at 60; Ex. 9 at 62.)  On the same day, Kerry Allen, the Plan Administrator, sent Plaintiffs a memo indicating that PNC did not believe they were eligible for benefits under any of the plans, and if they resigned, they would not be paid any severance benefits.  (Dkt. No. 35-3, Ferguson Decl., Ex. 10 at 87; Dkt. No. 35-9, Blehi Decl., Ex. C at 593.)  The memo also stated that if they did not agree with PNC's position, they could file a claim under the plans.  (Id.)  The official claim forms were attached to the memo.  (Id.)  The memo also indicated that their previous submissions, the letter dated March 16, 2010, would be treated as a "claim" under the plans they designated.  (Id.)  The Plan  Administrator further explained that the official claim forms would assist the Plan Committee[2] to fully consider their claims and stated they must be received no later than April 30, 2010.  (Id.)  Further, the Plan Administrator explained that the Committee would have 90 days from the date of the claim to review it.  (Id.)

On March 31, 2010, John Johnson, in-house counsel at PNC, sent Bluhm an e-mail indicating

---

[2]The Committee is responsible for administering the Plan. (Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 5.)

that it was PNC's position that she was not eligible for severance benefits under any plan regardless of whether she resigned that day.  (Dkt. No. 35-3, Ferguson Decl., Ex. 10 at 88.)  He also noted that in order to pursue a claim, she must first be terminated by PNC or terminate employment during the protection period which ended on that day, March 31, 2010.  (Id.) Johnson's e-mail requested that she inform them whether she would be terminating her employment effective that day.  (Id.)

On April 27, 2010, Plaintiffs were notified by PNC that their employment would be terminated effective June 26, 2010.  (Dkt. No. 35-4, Ferguson Decl., Ex. 12 at 249; Dkt. No. 35-5, Ferguson Decl., Ex. 13 at 367.)

On April 28, 2010, Becker, and on April 30, 2010, Bluhm submitted three separate official claim forms as to each of the plans.  (Dkt. No. 35-3, Ferguson Decl., Ex. 10 at 64, 89, 114; Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 126, 181, 212.)  On July 13, 2010, Bluhm and Becker submitted an amended and supplemental claim.  (Dkt. No. 35-4, Ferguson Decl., Ex. 12; Dkt. No. 35-5, Ferguson Decl., Ex. 13.)

On August 18, 2010, the First Level Claim and Appeal Committee denied Plaintiffs benefits. (Dkt. No. 35-5, Ferguson Decl., Ex. 14 at 478; Ex. 15 at 484.)  The First Claim and Appeal Committee consisted of Brian Ferguson, PNC's Vice President, Human Resources; Kerry Allen, PNC's Vice President, Corporate Benefits Manager; and James Popp, PNC's Director, Employee Relations. ( Dkt. No. 35-2, Ferguson Decl. ¶ 3.)  Plaintiffs filed an appeal of the decision that consisted of over 577 pages of documents.  (Dkt. No. 35-7, Blehi Decl., Ex. A.)

On December 17, 2010, the Second Level Claim and Appeal Committee denied Plaintiffs benefits under all the plans.  (Dkt. No. 35-9, Blehi Decl., Ex. B at 578; Ex. C at 590.)  The Second Level Appeal committee consisted of Joanne Blehi, Senior Vice President and Senior Human Resources Business Partner of PNC; Michael Braunstein, Vice President, Manager of Benefits Planning of PNC; and Kathleen D'Appolonia, Manager, Workplace Solutions and a Senior Vice President of PNC.  (Dkt. No. 35-6, Blehi Decl. ¶ 2.)

**A.     Severance Plans**

       **1.     The "2005 Plan"**

The 2005 Plan was effective on January 1, 2005.  (Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 1.)

The 2005 Plan provided severance benefits to Plaintiffs if National City was subject to a "Change in Control" as defined in the Plan.  (Id. at 4.)  "Change of Control" occurs when there is a sale, merger, reorganization or other event as provided in the Plan.  (Id. at 2.)  The "Protection Period" was the period of time "commencing on the Effective Date and continuing through to the fifteenth month anniversary of the Implementation Date."  (Id. at 10.)  The "Effective Date" is the date "uninterrupted discussion or negotiation" concerning a change of control commenced.  (Id. at 5.)

Under the 2005 Plan, once a Protection Period is triggered due to a Change in Control, a participant is entitled to severance benefits if the Surviving Entity terminates the participant's employment during the Protection Period or the participant terminates employment with the Surviving Entity during the Protection Period with the right to severance benefits based on certain events.  (Id. at 8-9.)  These events include, but are not limited to a substantial change in the participant's work responsibilities; a reduction in base salary; and/or a reduction in the base salary and incentive pay.  (Id.)

If the surviving entity fails to pay any severance benefits under the Plan, a participant may make a claim by "submitting a written request to the Committee on the form supplied for this purpose."  (Id. at 10.)  The 2005 Plan was administered by a Committee who "shall have full power and authority to interpret, construe and administer this Plan and its interpretations and construction hereof, and actions hereunder, including the timing, form, amount or recipient of any payment to be made hereunder, shall be binding and conclusive on all persons for all purposes." (Id. at 17.)  The Plan also provided that the Committee could amend or discontinue the Plan if it deemed necessary or desirable; however, the Plan could not be modified or terminated "after the Effective Date until the later of the end of the Protection Period or such time as all claims payable hereunder have been fully discharged."  (Id.)

The Plan also provided that it "shall be the sole severance compensation a Participant will be entitled to from the Surviving Entity as a result of a Change in Control.  Any Employee covered by this Plan shall not receive any other severance benefit after a Change in Control from any other severance plan, policy or agreement."  (Id. at 1.)

**2.      The 2008 Plan**[3]

On September 30, 2008, National City executed the 2008 Plan which became effective on the same day. (Dkt. No. 35-3, Ferguson Decl, Ex. 2 at 17.)  The 2008 Plan retained most of the provisions of the 2005 Plan except the 2008 Plan eliminated many of the provisions for eligibility.  The 2008 Plan only allowed benefits if, during the Protection Period, the participant was terminated by the surviving entity or if the participant voluntarily terminated employment following a reduction in base salary or a requirement that the participant change his principal location of work changed which is in excess of 50 miles from the location.  (Id. at 24-25.)

**3.      The Red Capital Plan**

The Red Capital Plan was effective as of January 1, 2008. (Dkt. No. 35-3, Ferguson Decl., Ex. 3 at 34.)  Plaintiff Bluhm, not Plaintiff Becker was a participant in the Red Capital Plan.  (Dkt. No. 35-2, Ferguson Decl., Ex. 3 at 46-47.)  The Plan provided severance benefits to certain named persons after a "Change in Control." (Id. at 39.)  A "Change in Control" was triggered by the sale of at least 90% of Red Capital's assets and liabilities to a non-affiliate.  (Id. at 41.)  The Plan provided benefits if after a "Change in Control," the participants were terminated during a "Protection Period" and if they voluntarily terminated based upon certain events such as a significant adverse change in job responsibilities, a reduction in base salary and incentive pay, a reduction in base salary and other events almost identical to the 2005 Plan.  (Id. at 38-39.)

Effective April 16, 2010, Joan Gulley, PNC, Executive Vice President and Chief Human Resources Offices discontinued the Red Capital Plan. (Dkt. No. 35-2, Ferguson Decl. ¶ 16; Dkt. No. 35-5, Ferguson Decl., Ex. 17.)

**4.      The "Interim Agreement"**

Plaintiffs also allege an unwritten and oral severance agreement.  According to Plaintiffs, Red Capital had its own written and adopted severance plan until National City acquired the company in 2004.  When National City took over, it terminated the plan but immediately began negotiations to reach a new separate severance plan specifically for Red Capital's key employees. (Dkt. No. 35-7, Blehi Decl., Ex. A at 126-32.)

---

[3]The parties dispute whether the 2008 Plan amended and superseded the 2005 Plan.

Plaintiffs allege that by March 17, 2005, the parties finalized a severance contract.  (Dkt. No. 35-8, Blehi Decl., Ex. A at 358-367.)  National City kept the severance agreement informal because of possible future changes that might be needed from the new regulatory provision relating to Internal Revenue Code § 409(A).  (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 177-78.)

The alleged Interim Agreement was similar to the 2005 Plan with two increased benefits.  First, the definition of "Change of Control" was increased to include a change to either National City or Red Capital.  (Dkt. No. 35-8, Blehi Decl., Ex. A at 381.)  Second, the Interim Agreement increased the amount of severance pay for a subset of employees, including Bluhm.  (Id.)

**Discussion**

**A.      Legal Standard for Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.  If the non-moving party

1    fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment

2    as a matter of law.  Id. at 325.  "Where the record taken as a whole could not lead a rational trier of

3    fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co.

4    v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[]

5    the evidence in the light most favorable to the nonmoving party."  Fontana v. Haskin, 262 F.3d 871,

6    876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence,

7    or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  Anderson,

8    477 U.S. at 255.

9    **B.   ERISA Standard of Review**

10         Defendants argue that an "abuse of discretion" standard of review applies while Plaintiffs assert

11   a "de novo" standard of review applies as there is a conflict of interest and because the plans are "top

12   hat."

13         The United States Supreme Court has held that a denial of benefits is reviewed *de novo* when

14   the plan does not confer discretion on the administrator "to determine eligibility for benefits or to

15   construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

16   If *de novo* review applies, no further preliminary analytical steps are required and the court proceeds

17   to evaluate whether the plan administrator correctly or incorrectly denied benefits without regard to

18   whether the administrator operated under a conflict of interest.  Abatie v. Alta Health & Life Ins. Co.,

19   458 F.3d 955, 963 (9th Cir. 2006).  If a plan confers discretionary authority as a matter of contractual

20   agreement, then the standard of review shifts to an abuse of discretion.  Firestone Tire & Rubber Co.,

21   489 U.S. at 115.  The plan must unambiguously provide discretion to the administrator.  Id.

22         In applying the abuse of discretion standard, the Court must reverse the determinations of the

23   plan administrator if they are arbitrary and capricious after looking at the plain language of the plan.

24   Canseco v. Constr. Laborers Pension Trust, 93 F.3d 600, 606 (9th Cir. 1996).  "A plan administrator's

25   decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a

26   reasonable interpretation of the plan's terms and if it was made in good faith."  McDaniel v. Chevron

27   Corp., 203 F.3d 1099, 1113 (9th Cir. 2000). The question is not "whose interpretation of the plan

28   documents is most persuasive, but whether the . . . interpretation is unreasonable."  Canseco, 93 F.3d

at 606 (citations and internal quotations omitted).

If a plan gives discretion to an administrator who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone Fire & Rubber Co., 489 U.S. at 115; see Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (a conflict of interest will be found where the "entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible and pays benefits out of its own pocket."); Conkright v. Frommert, 130 S. Ct. 1640, 1646 (2010) (When the terms of a plan grants discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict.)

In following the United States Supreme Court, the Ninth Circuit has held that the "[a]buse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest." Abatie, 458 F.3d at 965. When there is a conflict of interest, such as when a plan administrator both administers the plan and funds it, the Ninth Circuit held that the standard of review is an abuse of discretion review "but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Id. at 967. "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying . . . coverage." Id. at 968. For instance, if a conflict of interest involves evidence of malice, self-dealing or parsimonious claims-granting history, the court may weigh a conflict more heavily than a conflict of interest without evidence of malice or self-dealing. Id. A court may weigh the conflict more heavily if there's evidence that the administrator has given "inconsistent reasons for denial . . . failed adequately to investigate a claim or ask the plaintiff for necessary evidence . . . fails to credit a claimant's reliable evidence . . . or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." Id. at 968-69.

"The conflict of interest requires additional skepticism because the plan acts as judge in its own cause." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 675 (9th Cir. 2011). "[W]e held that the test for abuse of discretion in a factual determination (as opposed to legal error) is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we

may not merely substitute our view for that of the fact finder. To do so, we consider whether application of a correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record. That standard makes sense in the ERISA context, so we apply it, with the qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest." Id. (citing United States v. Hinkson, 585 F.3d 1247 (9th Cir. 2009)).

However, if an administrator "engages in wholesale and flagrant violation of the procedural requirements of ERISA and thus acts in utter disregard of the underlying purpose of the plan as well", the Court reviews de novo the administrator's decision to deny benefits. Abatie, 458 F.3d at 971; see also Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005) (de novo review applies where the administrator has a serious conflict of interest that the beneficiary can demonstrate with "material, probative evidence, beyond the mere fact of an apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary.")

Plaintiffs argue that a de novo standard of review applies because Defendants had "an extreme and pervasive conflict of interest with actual malice." (Dkt. No. 44, P's Opp. at 11.) Plaintiffs contend that Defendants failed to exercise discretion, failed to adequately investigate and failed to ask for necessary evidence because they "merely swallowed whatever answer higher executives dictated" and this can be shown in the immediate summary denial of claims issued during negotiations for the sale of Red Capital in March 2010.  In addition, Plaintiffs allege there was an "aggressively hostile and adversarial attitude by the Plan Administrator and Committee, with demonstrable malice and ill will toward Plaintiffs." (Dkt. No. 44, P's Opp. at 12.) Moreover, Plaintiffs argue that the members of both committees and their boss worked closely with PNC executives in the deal between PNC and Orix.

Despite these extensive allegations of malice and ill-will, Plaintiffs fail to provide specific facts explaining how Defendants failed to exercise discretion, what specific issue or fact Defendants failed to adequately investigate and what specific evidence they failed to ask about.  Although Plaintiffs assert there was a summary denial as to their claims, the initial denial was not a decision by the Committees.  A review of the decision by the Committees reveals a detailed and thorough analysis of

1  the issues Plaintiffs' assert.  (Dkt. No. 35-3, Ferguson Decl., Ex. 14 a 478, 484; Dkt. No. 35-9, Blehi

2  Decl., Ex. B at 578, 590.)

3        Except for Brian Ferguson, Plaintiffs have also not shown that the members of both committees

4  were involved in the PNC/ORIX deal.  Defendants concede that only Brian Ferguson had involvement

5  in the deal but his involvement consisted of calculating the potential amounts of severance claims

6  under the applicable plans.  (Dkt. No. 44-3, Rezzo Decl., Ex. 51 at 301-05.)[4]

7        David Williams, senior Vice President, Director of Mergers & Acquisitions for PNC, was the

8  chief negotiator for PNC regarding the sale of Red Capital to ORIX in 2010.  (Dkt. No. 44-3, Rezzo

9  Decl., Ex. 51 at 290.)  Williams testified that he did not know who was on the severance plan

10  committee.  (Dkt. No. 44-3, Rezzo Decl., Ex. 51 at 300-01.)  Brian Ferguson told him he was on the

11  committee or working on behalf of the committee to conduct follow-up on some questions.  (Id.)

12  David Williams stated that he asked Ferguson questions concerning the severance liability for a person

13  under all the various plans.  (Dkt. No. 44-3, Rezzo Decl., Ex. 51 at 302.)  There were e-mail

14  communications between Ferguson and Williams which concerned Ferguson investigating Plaintiffs'

15  claims.  (Dkt. No. 44-2, Rezzo Decl., Ex. 48 at 194-96.)  Williams states he did not discuss with

16  Ferguson about how the committee would be responding to Plaintiffs' letters of March 2010.  (Dkt.

17  No. 44-3, Rezzo Decl., Ex. 51 at 301.)  Even though Ferguson was in communication with David

18  Williams, there is no indication or evidence that David Williams influenced Ferguson to deny

19  Plaintiffs' claims.  Moreover, Ferguson was only one out of three committee members on the First

20  Level Claims Committee.  Furthermore, Plaintiffs have not shown that the members of the Second

21  Level Appeals Committee had any connection with the PNC/ORIX deal.

22        As to the allegations of malice and self dealing by the Committee members, Plaintiffs cite to

23  emails between executives within PNC and between PNC and Red Capital concerning the deal and

24  the March 16, 2010 letters written by Plaintiffs and others. The March 16 letters caused a delay in the

25  signing of the sale between PNC and ORIX.  The emails demonstrate that executives from both sides

26  were not happy and upset with these letters.  (Dkt. No. 44-2, Ex. 9 at 59-60; Ex. 12 at 74; Ex. 24 at

27

28      [4]The Court may consider documents outside the administrative record when determining if a conflict of interest affected ERISA benefits decision.  Tremain v. Bell Indus., Inc., 196 F.3d 970, 977 (9th Cir. 1999).

114-15.)  However, the email recipients do not include any members of the either Committee. Although Joan Gulley, the head of Human Resources was a recipient the emails, Plaintiffs assume that because she is the boss of several members of the six member Committee, those members were biased against Plaintiffs.  Plaintiffs have not shown any evidence to show that Gulley influenced the decisions of the Committee members. Therefore, Plaintiffs have not shown that the Committee members exhibited any malice or ill will towards Plaintiffs.

Here, the 2005, 2008 and Red Capital Plan all grant the Committee "full power and authority to interpret, construe and administer this Plan and its interpretations and construction hereof, and actions hereunder, including the timing, form, amount or recipient of any payment to be made hereunder, shall be binding and conclusive on all persons for all purposes."  (Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 14; Ex. 2 at 29; Ex. 3 at 44.)  Since the Plans expressly give the Committee discretion to determine eligibility for benefits and to construe the terms of the plan, the abuse of discretion standard applies.  However, a structural conflict of interest arises because the Administrator, in this case, evaluates the claims and funds the plan.  See Met Life, 554 U.S. at 111; Abatie, 458 F.3d at 965. Defendants do not dispute this issue and admit that the members of the two committees which made the benefit decisions were employees of PNC which is the entity responsible for paying benefits under the plans at issue.  (See Dkt. No. 44-2, Rezzo Decl., Ex. 2 at 14.)  Accordingly, the Court reviews the administrative record for an abuse of discretion with the conflict of interest being weighed as a factor in determining whether the Committee members abused their discretion.

**1.      Standard of Review as to Top Hat Plans**

For purposes of this motion, the parties agree that the Plan is also a "top hat" plan under ERISA.  (Dkt. No. 35-1, D's Mem. of P & A at 14-15; P's Opp at 9.)  ERISA defines a top hat plan as one "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1). ERISA exempts such plans "from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans." Duggan v. Hobbs, 99 F.3d 307, 310 (9th Cir. 1996) (citing 29 U.S.C. § 1101(a)(1) (exemption from fiduciary responsibilities); id. § 1081(a)(3) (exemption from minimum funding standards); id. § 1051(2)

1    (exemption from participation and vesting requirements)).

2          The Ninth Circuit has held that courts should follow the Supreme Court's framework as to the

3    standard of review in <u>Firestone</u> and <u>Metlife</u> for all covered plans, including top hat plans.[5]  <u>Sznewajs</u>

4    <u>v. U.S. Bancorp Amended and Restated Supplemental Benefits Plan</u>, 572 F.3d 727, 734 (9th Cir.

5    2009) (rev'd on other grounds in <u>Salomaa v. Honda Long Term Disability Plan</u>, 642 F.3d 666 (9th Cir.

6    2011)).  The Court in <u>Sznewajs</u> explained that changing the standard of review as to top hat plans

7    would not lead to a materially different result because ordinary contract principles require a reviewing

8    court to give full effect to the entire pension plan, including a provision granting the administrator

9    discretion in interpretation.  <u>Id.</u> at 734.  Therefore, in <u>Sznewajs</u>, the Ninth Circuit applied the abuse

10   of discretion standard review to a top hat plan.  <u>Id.</u>

11         Based on the discussion above, the Court will review the administrative record for an abuse

12   of discretion with the conflict of interest being weighed as a factor in determining whether the

13   Committee members abused their discretion.

14   **C.    2008 Amendment to 2005 Plan and Interim Agreement**

15         In their Complaint, Plaintiffs seek severance benefits under the Interim Agreement,[6] and

16   alternatively, seek benefits under one of the three other Plans asserted.  In their motion for summary

17   judgment, Defendants argue that the 2005 Plan and the alleged "Interim Agreement" were amended

18   and superseded when the 2008 Plan amended any prior plans when it became effective on September

19   30, 2008.  Plaintiffs contend the prior plans were improperly amended as they failed to receive notice

20

21

22         [5]The Third and Eighth Circuits have held that *de novo* review applies to top hat plans even
     when the plans grant plan administrators discretion because "a top hat administrator has no fiduciary
23   responsibilities" under ERISA.  <u>Goldstein v. Johnson & Johnson</u>, 251 F.3d 433, 443 (3d Cir. 2001);
     <u>see also</u> <u>Craig v. Pillsbury Non-Qualified Pension Plan</u>, 458 F.3d 748, 752 (8th Cir. 2006) (applying
24   *de novo* review; however, since Plan granted administrator discretion to interpret its terms, as a matter
     of contract, it must be given effect as ordinary contract principles, so the court had to determine
25   whether the Plan's decision was reasonable.)

26         [6]Defendants contend that there was no valid Interim Agreement, and even if there was such an
     agreement, it is preempted by ERISA.  Plaintiffs argue that there was a valid, enforceable oral Interim
27   Agreement that is not preempted by ERISA.  The parties assert arguments in support of their positions
     as to the alleged Interim Agreement.  However, as the Court concludes that the 2008 Plan amended
28   and superseded any prior plans, including the 2005 Plan and alleged Interim Agreement, the Court
     need not address the validity and/or the preemption issue as to the Interim Agreement.

of the changes until after the plan became effective[7] and Defendants concealed changes to the severance plan so as to purposely deny benefits.

Plaintiffs further argue that the 2008 amendment was not proper as Defendants' interpretation of the "protection period" for purposes of amending a plan is unreasonable. Therefore, Plaintiffs contend that the prior Interim Agreement or the 2005 Plan applies to Plaintiffs.

Under ERISA, employee benefits are divided into two categories: 1) welfare benefits; and 2) retirement or pension benefits. 29 U.S.C. § 1002(1)-(2). ERISA designates "severance pay arrangement" to be treated as welfare plans, and not pension plans. 29 U.S.C. § 1002(2)(B). "Severance benefit plans are welfare benefit plans subject to certain disclosure requirements and fiduciary responsibility standards, 29 U.S.C. §§ 1101-1114, 1021-1031, but exempt from the more stringent requirements of ERISA, such as its vesting, participation and funding requirements, . . . 29 U.S.C. §§ 1051(1), 1081(a)(1)." Joanou v. Coca-Cola Co., 26 F.3d 96, 98 (9th Cir. 1994). Moreover, as these plans at issue are top hat plans, the fiduciary requirements are not applicable. See 29 U.S.C. §§ 1051(2), 1081(a)(3); 1101(a)(1); 29 C.F.R. § 2520.104-23. "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits," nor does it "establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." Varity Corp. v. Howe, 516 U.S. 489, 532 n. 11 (2006).

"Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). "While employers who choose to provide a severance plan assume certain fiduciary duties in *administering* it, they remain free to unilaterally *amend* or *eliminate* such plan without considering the employees' interests." Joanou, 26 F.3d at 98 (emphasis in original) (citation omitted); see also

---

[7]Plaintiffs also assert that Defendants retroactively applied the changes after benefits vested. However, severance benefits do not vest if the plan does not expressly vest benefits and reserves the employer's right to modify or terminate the plan. Gonzales v. Phelps Dodge Miami, Inc., 276 Fed. App'x 622, 624 (9th Cir. 2008) (citing Gable v. Sweetheart Cup Co., 35 F.3d 851, 856 (4th Cir. 1994) (holding that a "modification clause, standing alone, is more than sufficient to defeat plaintiffs' claim that the company provided vested benefits")); Alday v. Container Corp. of Am., 906 F.2d 660, 666 (11th Cir. 1990) (rejecting a claim for vested lifetime benefits due, in part, to the company's express reservation of the right to terminate the plan); Moore v. Metro. Life Ins. Co., 856 F.2d 488, 492-93 (2d Cir. 1988) (same)). In this case, Plaintiff have not shown that their severance benefits had vested under the provisions of the plans.

1    Hozier v. Midwest Fateners, Inc., 903 F.2d 1155, 1161 (3d Cir. 1990) ("Virtually every circuit has

2    rejected the proposition that ERISA's fiduciary duties attach to an employer's decision whether or not

3    to amend an employee benefit plan.").  An "employer does not owe its employees a fiduciary duty

4    when it amends or abolishes a severance benefit plan." Joanou, 26 F.3d at 99; Gonzales v. Phelps

5    Dodge Miami, Inc., 2006 WL 987960 (9th Cir. 2006) (granting Defendant's motion for summary

6    judgment as to Plaintiff's claim that the Severance Plan was terminated without notice to Plaintiffs and

7    without their consent because the severance plan did not expressly vest welfare benefit and reserved

8    the employer's right to terminate the severance plan).

9         Since a severance plan is considered an employee welfare benefit plan, it  must comply with

10   the ERISA notification requirement.  Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 789 (7th

11   Cir. 1996).  Employees must be notified of material modifications of covered benefit plans "not later

12   than 210 days after the end of the plan year in which the change is adopted to each participant . . . ."

13   29 U.S.C. § 1024(b)(1)(B).

14        Technical violations of procedural rules are not subject to damages unless the participant can

15   show active concealment of the amendment or possible prejudice flowing from the lack of notice.

16   Blau v. Del Monte Corp., 748 F.2d 1348, 1353 (9th Cir. 1984) abrogation on other grounds recognized

17   by Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889, 894 n. 4 (9th Cir .1990) (district court erred

18   in holding employer's denial of severance benefits was not arbitrary and capricious where

19   administrator failed to comply with reporting, disclosure and fiduciary requirements as facts

20   demonstrated that separation policy was confidential; policy was subject to no claims procedure; there

21   was no summary plan description; and there was no provision to inform participants in writing of

22   anything).

23        The 2005 Plan provides:

24        [t]he Corporation expects to continue this Plan indefinitely, but reserves the right,
          by action of the Committee, to amend it from time to time, or to discontinue it if
25        such a change is deemed necessary or desirable.  This Plan shall not, however, be
          amended modified or discontinued after the Effective Date until the later of the end
26        of the Protection Period or such time as all claims payable hereunder have been
          fully discharged.
27
28   (Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 14.)  The alleged Interim Agreement had a similar provision

     as to amendments.  (Dkt. No. 35-8, Blehi Decl., Ex. A at 380.)  The plan provisions allow for the

1   amendment of the plans.  In this case, Plaintiffs state they received notice about the 2008 Plan on

2   November 3, 2008 when National City sent an announcement claiming it had changed the terms of the

3   2005 National City Plan by adopting a new severance plan effective September 30, 2008.  (Dkt. No.

4   44-5, Bluhm Decl. ¶ 3; Dkt. No. 44-4, Becker Decl. ¶ 3.)  Under the statute, Plaintiffs properly

5   received notice of the amendment within 210 days after the end of the plan year.  See 29 U.S.C. §

6   1024(b)(1).

7          Although Plaintiffs allege that Defendants concealed material information regarding the 2008

8   plan changes and that they told those with knowledge about the changes not to disclose them to the

9   participants, they have not directed the Court to any evidence in the administrative record to support

10  this allegation.  (Dkt. No. 44 at 16-17, 20.)  Moreover, Plaintiffs' argument that top hat plan may be

11  enforced under common law rules of unilateral contract is untenable.  The cases cited by Plaintiffs in

12  support of their argument concerned vested plans where the participant begins performance such as

13  electing to defer their income.  Here, Plaintiffs provide no supporting facts that a unilateral contract

14  existed.

15         Plaintiffs also argue that the Committees' interpretation of the plan documents concerning

16  the Plan could not be amended "after the Effective Date until . . . the end of the Protection Period."

17  (See Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 14; Dkt. No. 35-8, Blehi Decl., Ex. A at 380.)  The 2005

18  Plan defines "Effective Date" as "[i]n the event a Change in Control ultimately results from

19  discussions or negotiations involving the Corporation or any of its officers or directors, the 'Effective

20  Date' of such Change in Control shall be the date *uninterrupted discussions or negotiations*

21  *commenced*."  (Dkt. No. 35-5, Ferguson Decl., Ex. A at 5) (emphasis added).

22         The parties dispute the interpretation of the "Effective Date" and when "uninterrupted

23  discussions or negotiations commenced" regarding a change in control.  PNC acquired National City

24  on December 31, 2008, which the parties do not dispute is a change in control under the Plan.

25  Defendants assert that the Committee reasonably determined that "uninterrupted discussions or

26  negotiations" refer to uninterrupted negotiations involving the ultimate buyer which began on October

27  3, 2008 between PNC and National City.  Plaintiffs contend that "uninterrupted discussions or

28  negotiations" means internal discussions between company executives about a possible business deal.

1   They argue that the uninterrupted discussions occurred throughout 2008 when the employees knew

2   about plans to sell the business but more specifically on September 29, 2008 when Goldman Sachs

3   made a presentation to representatives of National City regarding potential buyers.

4        Both Committees determined that uninterrupted negotiations between PNC and National City

5   commenced on October 3, 2008, several days after the 2005 National City Plan was amended. (Dkt.

6   No. 35-5, Ferguson Decl., Ex. 14 at 482, 488; Dkt. No. 35-9, Blehi Decl., Ex. B at 585, 597.) Both

7   based their decision on an e-mail from David J. William to Brian Ferguson dated August 2, 2010, that

8   "uninterrupted negotiations ultimately leading to PNC's acquisition of National City did not occur

9   until October 2008." (Id.) The Second Appeals committee further explained that mere internal

10   discussions among the officers and directors do not trigger the effective date. (Dkt. No. 35-9, Blehi

11   Decl., Ex. B at 585.) It also explained that the Goldman Sachs presentation did not constitute

12   negotiation with a potential transaction partner but was a presentation regarding transaction structures

13   and potential acquirers. Id.

14        A review of the administrative record and the plain language of the Plan reveal that the

15   Committee members reasonably determined that the 2005 Plan and the alleged Interim Agreement

16   were properly amended under Section 2.1(i) of the 2005 Plan. The key determinative point is

17   interpreting the "Effective Date" provision. It provides that if a change in control *"ultimately results*

18   *from discussions or negotiations involving the Corporation or any of its officers or directors, the*

19   'Effective Date' of such Change in Control shall be the date *uninterrupted discussions or negotiations*

20   *commenced.*" (Dkt. No. 35-5, Ferguson Decl., Ex. A at 5) (emphasis added). The Court finds that

21   Committees' interpretation that uninterrupted negotiations involving the ultimate buyer is reasonable.

22        In coming to their conclusion, the committee members relied on an e-mail from Dave

23   Williams, senior Vice President, Director of Mergers & Acquisitions for PNC, to Brian Ferguson dated

24   August 2, 2010, sixteen days before the first appeal decision. (Dkt. No. 35-5, Ferguson Decl., Ex. 18

25   at 492.) The e-mail concerned the change in control issue and stated "[w]e were first notified that

26   another process was going to take place regarding NCC on October 3, 2008 and we signed a

27   confidentiality agreement on October 5, 2008 to enter the process." (Id.) Both committees stated that

28   the e-mail dated August 2, 2010 states that negotiations began on October 3, 2008. (Dkt. No. 35-5,

Ferguson Decl, Ex. 14 at 481; Ex. 15 at 487; Dkt. No. 35-9, Blehi Decl., Ex. B at 585; Ex. C at 597.) Plaintiffs object to the Committees relying on one e-mail to make their determination because the interpretation of a plan must be made by the delegated person and not by a biased PNC executive.

The record reveals that although there were negotiations between National Bank and other banks in the spring of 2008, final uninterrupted negotiations with PNC began in early October 2008. (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 197-205.)  In the administrative record, there is a partial transcript of a conference call of investors regarding the National City Corporation acquisition.  (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 211). In answering a question by an investor about when the due diligence process started, Jim Rohr, PNC's Chairman and CEO, stated "That's a good question. Months ago.  We talked to National City months ago, and we've been talking to them on and off ever since."  (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 211; Dkt. No. 35-9, Blehi Decl., Ex. A at 542.) Rick Johns, PNC's CFO, added "this round started October 5, but we had many rounds before that." (Dkt. No. 35-4, Ferguson Decl., Ex. 11 at 211; Dkt. No. 35-9, Blehi Decl., Ex. A at 542.)  Although National City had discussions about its sale in 2008 with different potential buyers, it was not until negotiations began again with PNC on October 5 that finally led to its sale.

Plaintiff's position that the meeting with Goldman Sachs was the beginning of uninterrupted discussions is not persuasive as the meeting was provided to National City to discuss the list of numerous "potential strategic partners." (Dkt. No. 35-4, Ferguson Decl., Ex. 12 at 322-351.)  The meeting did not consist of negotiations or discussion with a specific potential buyer that resulted in a sale.

Based on the administrative record and the plain language of the Plan, there was a reasonable basis for the Committees to conclude that uninterrupted discussion began on October 3, 2008 and that the 2008 Plan amended and superseded any prior plans.

**D.    Failure to Comply with Plan Procedure**

Defendants argue that the Committee provided a detailed analysis of the "deemed approved" allegation and reasonably concluded that the August 18, 2010 denial letter was timely.  Plaintiffs assert that Defendants failed to comply with the Plan procedure by failing to timely respond to Plaintiffs' claims by July 14, 2010,  within 120 day of the receipt of the claim, and therefore their claims are

"deemed to have been approved."  (Dkt. No. 35-3, Ferguson Decl., Ex. 1 at 10-11; Ex. 2 at 26-27; Ex. 3 at 41.)

Section 5.2 of each of the written Plans provides:

> If a notice of denial is not received by a Participant within the lesser of (a) 120 days of the Committee's receipt of the claim or (b) within 30 days of the Committee's . . . making its determination with respect to the Participant's claim, the claim shall be deemed to have been approved.

(Dkt. No. 35-2, Ferguson Decl., Ex. 1 at 11; Ex. 2 at 26; Ex. 3 at 41.)

The Second Appeals Committee concluded that the "deemed approved" provision in the 2005 Plan was denied since the Plan ceased to exist as of September 30, 2008.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 581; Ex. C at 593.)  As to the 2008 Plan and the Red Capital Plan, the Committee concluded that the March 16, 2010 letter did not constitute a claim pursuant to the terms of either Plan.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  In accordance with the provision in both Plans, the Committee explained that receipt of the official claim forms triggers the commencement of the 120 day period.  Becker and Bluhm submitted the official claim forms on April 28, 2010.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  On July 12, 2010, Bluhm and Becker submitted an amended and supplemental claim.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)

The Committee explained that despite the fact that the March 31, 2010 memorandum states that the March 16, 2010 letter will be treated as a claim, "it does not obviate the need to comply with the express terms of the Plans."  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  Therefore, the Committee concluded that Plaintiffs' claims were perfected according to both Plans on the date each claim form was received by the Plan Administrator, which was April 28, 2010.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  Therefore, the 120 day period did not expire on July 14, 2010.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  The Committee also noted that Plaintiffs' amended and supplemental claims were submitted on July 13, 2010, one day before the alleged time period expired.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)  In conclusion, the Committee concluded that the August 18, 2010 initial denial letter was timely.  (Dkt. No. 35-9, Blehi Decl., Ex. B. at 582; Ex. C at 594.)

The Committee further noted that although it treated the Claims Forms as legitimate claims for benefits, the Committee did not have an obligation to do so because the Plans require that a

1  participant experiences a termination of employment during a Change in Control.  (Dkt. No. 35-9,

2  Blehi Decl., Ex. B. at 582; Ex. C at 594.)

3       According to provisions in the 2008 Plan and the Red Capital Plan, the Committee is to

4  provide a decision within 120 day after receipt of the claims.  Pursuant to the express terms of the

5  Plans, Becker submitted his official claim form on April 28, 2010 while Bluhm submitted her official

6  claim form on April 30, 2010.  A decision was issued on August 18, 2010.  Therefore, the Committee

7  reasonably concluded that Defendants did not fail to comply with Plan procedures.

8  **E.    2008 Plan**

9       Defendants maintain that the Committees reasonably concluded that Plaintiffs are not entitled

10  to benefits under the 2008 Plan.  Plaintiffs assert that they are entitled to benefits as they were

11  terminated during the protection period based on loss of job duties and pay.

12       Based on the provisions in the 2008 Plan, the Second Appeal Committee determined that the

13  2008 Plan does not provide benefits unless one is terminated.  (Dkt. No. 35-9, Blehi Decl., Ex. B at

14  587; Ex. C at 598-99.)  Therefore, Plaintiffs' alleged claims for benefits in March 2010 do not entitle

15  her to benefits since she did not actually separate from service until June 26, 2010, almost three

16  months past the protection period.  (Id.)

17       The parties dispute when Plaintiffs were terminated which is determinative as to whether the

18  provisions under the 2008 Plan were triggered.  Defendants contend that Plaintiffs were not terminated

19  until June 26, 2010, the last day they were paid while Plaintiffs argue that they terminated employment

20  March 31, 2010, the day they filed their conditional termination letter, with prior notice given on

21  March 16, 2010, the day they sent letters  about severance claims giving a 10 day opportunity to

22  remedy their loss of pay and job duties.

23       The 2008 Plan provides that an individual is generally entitled to severance benefits if during

24  the Protection Period her employment is terminated.  (Dkt. No. 35-3, Ferguson Decl., Ex. 2 at 23-24.)

25  The Protection Period is the period of time beginning on the Effective Date and continuing through

26  the fifteenth month anniversary of the Implementation Date.  (Id. at 23.)  The sale of National City to

27  PNC occurred on December 31, 2008.  Therefore, the parties do not dispute that the Protection Period

28  ended on March 31, 2010.  According to the provision of the 2008 Plan, a participant must be

terminated or terminate his or her employment during the Protection Period in order to be eligible for benefits under the 2008 Plan.

The Committee determined that Plaintiffs' actual termination from service was on June 26, 2010. (Dkt. No. 35-9, Ex. B at 587; Ex. C at 599.) Therefore, the Committee reasonably concluded that Plaintiffs were not eligible for severance benefits under the 2008 Plan.

Moreover, Defendants argue that even if Plaintiffs' conditional resignations on March 31, 2010 were construed as a termination, to obtain benefits under the plan, Plaintiffs did not suffer a reduction in base salary or change in their principal location of work as required under the Plan. Plaintiffs argue that their job duties and incentive pay dramatically decreased; however they do not assert whether their base salary was reduced or was required to change their principal location of work. The 2008 Plan dramatically reduced eligibility to benefits to two circumstances: a reduction in base, not incentive, salary and a change in work location. Therefore, the Court concludes that the Committee was reasonable based on the plain language of the Plan and documents in the record that Plaintiffs were not entitled to benefits under the 2008 Plan.

**F.    Red Capital Plan**

Defendants argue that the Committees reasonably concluded that Plaintiffs have no claim for benefits under the Red Capital Plan because the Plan was terminated on April 16, 2010 and the ORIX transaction was not a change in control under the Plan.

Plaintiff Bluhm, not Becker was a participant of the Red Capital Plan. (Dkt. No. 35-2, Ferguson Decl., Ex 3 at 46-47.) A Change in Control was triggered by a sale of at least 90% of Red Capital's assets and liabilities. (Id. at 36.) The Red Capital Plan provided that participants would be entitled to benefits if, after a Change in Control, they were terminated during a "Protection Period" or if they voluntarily terminate based upon a change in job responsibilities, reduction in salary and other events. (Id. at 38-39.) On April 16, 2010, Joan Gulley, PNC Executive Vice President and Chief Human Resources Officer, discontinued the Red Capital Plan. (Dkt. No. 35-2, Ferguson Decl. ¶16; Ex. 17.)

The Second Level Appeal Committee concluded that the sale of Red Capital to ORIX on May 8, 2010 did not result in a change of control because the ORIX sale did not involve at least 90% of Red

Capital's assets and liabilities.  (Dkt. No. 35-9, Blehi Decl., Ex. B at 588; Ex. C at 600.)   The Committee based it conclusion on an e-mail from David Williams to Brian Ferguson stating that the ORIX did not involve at least 90% of Red Capital's assets and liabilities. (Dkt. No. 35-9, Blehi Decl., Ex. B at 588; Ex. C at 600.)   In addition, it concluded that the Red Capital Plan was properly terminated by Joan Gulley effective April 16, 2010 because the change in control provision were not triggered since the sale to ORIX did not occur until May 8, 2010.  Therefore, the Red Capital Plan was not in existence when Plaintiffs' employment terminated on June 26, 2010.  (Dkt. No. 35-9, Blehi Decl., Ex. B at 588; Ex. C at 600.)

In opposition, Plaintiffs argue that the termination of the Red Capital Plan was not properly done as the Plan required the Committee to terminate a plan, and could not be terminated by a single person.  While the 2005 and 2008 Plans requires the Committee to amend or discontinue the plan, the Red Capital Plan provides that it reserves the right, "by action of an officer of Corporation," to amend or discontinue.  (Dkt. No. 35-3, Ferguson Decl., Ex. 3 at 44.)  On April 16, 2010, by action of Joan Gulley, PNC, Executive Vice President and Chief Human Resources Officer, PNC discontinued the Red Capital Plan.  (Dkt. No. 35-5; Ferguson Decl., Ex. 17.)  Therefore, the Court concludes that the Committee's decision that Plaintiffs were not entitled to benefits under the Red Capital Plan was reasonable.

**G.     ERISA Retaliation**

Plaintiffs allege an ERISA retaliation claim under 29 U.S.C. § 1140.  (Compl. ¶¶ 33-34.) Plaintiffs claim that they were retaliated and discriminated against based on their claims for severance benefits.  (Id.) Specifically, they contend that during the sale of Red Capital to ORIX, employees were offered ongoing employment to the successor company only if they waived their rights to severance  claims but not to those who did not waive their rights.  (Id.)

Defendants argue that Plaintiffs were not eligible for severance benefits until they were terminated from employment.  Therefore, Plaintiffs' March 16, 2010 letter was not exercising any right under the severance plan and Defendants could not be interfering with the attainment of any right since they were not terminated until June 26, 2010, three months after the protection period expired. Moreover, Defendants argue that both employees were offered post-closing employment along with

a release of all employment claims against PNC, ORIX and Red Capital. (Dkt. No. 35-1, D's Mem. of P & A at 25.) Since both Plaintiffs did not sign the release, their employment was terminated effective June 26, 2010. (Id.) Defendants state that although Becker did not actually receive the offer of post-closing employment and release document, he was aware of the release requirement for post-closing employment. (Id.)

In March 2010, PNC was in negotiations with ORIX regarding the sale of Red Capital. The signing of the agreement was to take place on March 17, 2010. (Dkt. No. 44-3, Rezzo Decl., Ex. 51 at 294.) However, with the receipt of the letters dated March 16, 2010 from seven or eight employees, the signing did not take place. (Id.) On March 17, 2010, ORIX indicated, by email, that they may not proceed with the transaction based on the receipt of seven or eight letters from Red Capital employees making a claim for severance benefits. (Id. at 293.) In order to alleviate concerns, the parties added an unscheduled termination provision to include these Plaintiffs. (Id. at 297-98.)

29 U.S.C. § 1140 provides that

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan. . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . .

29 U.S.C. § 1140. The United States Supreme Court has held that this provision applies to welfare plans. Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co., 520 U.S. 510, 515 (1997). The Court explained that employers have flexibility in amending or eliminating their welfare plans because it encourages "them to offer more generous benefits at the outset, since they are free to reduce benefits should economic conditions sour." Id. at 515. Section 1140 counterbalances the flexibility by making sure that employers do not "circumvent the provision of promised benefits." Id. (citation omitted).

The Ninth Circuit has adopted the burden shifting analysis in McDonnell Douglas. Ritter v. Hughes Aircraft Co., 58 F.3d 454, 457 (9th Cir. 1995). To establish a claim under section 510 of ERISA, a plan participant must establish a prima facie case of a violation under section 510. Benson v. Long Term Disability Income Plan For Employees of Xerox, 108 F. Supp. 2d 1074, 1085 (C.D. Cal. 1999) (citing Ritter v. Hughes Aircraft Co., 58 F.3d 454, 457–58 (9th Cir.1995)). Plaintiff must

1    establish that her employment was terminated "because of a specific intent to interfere with ERISA

2    rights." Id. (citing Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889, 896 (9th Cir. 1990)).

3    Plaintiffs must show "(1) an employee participates in a statutorily protected activity, (2) an adverse

4    employment action is taken against him or her, and (3) a causal connection existed between the two."

5    Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 881 (9th Cir. 1989).  Plaintiffs must show that their

6    letters of March 16, 2010 was the motivating force behind their terminations.  See id.

7        Once Plaintiffs make a prima facie case of discrimination, the burden shifts to Defendants to

8    articulate a legitimate non-discriminatory reason for its employment decision.  Benson, 108 F. Supp.

9    2d at 1085.  Then Plaintiffs must demonstrate that the employer's proffered reason for the adverse

10   employment decision was a pretext  for discrimination.  Id. at 1085-86.

11       The Court must determine whether Plaintiffs have shown that they were participating in a

12   statutorily protected activity.  Defendants argue they were not participating in a protected activity as

13   they were not entitled to benefits until they were terminated or terminated their employment.

14       On November 14, 2012, Plaintiffs filed a Notice of Ruling in Related Case.  (Dkt. No. 50-1,

15   Jones et al. v. Allen et al., 11cv380 (S.D. Ohio 2012.)  That case involved a plaintiff in Ohio who was

16   one of the seven or eight employees who sent the letter on March 16, 2010.  (Id.)  The Court denied

17   the parties' motion for partial summary judgment on this issue.  (Id.)  In responding to Defendants'

18   argument that the retaliation claim fails since Plaintiff was not entitled to benefits, the district court

19   concluded that whether Plaintiff has a meritorious claim benefits is not part of the analysis for a

20   retaliation claim.  (Id. at 15.)  The Court concluded that Plaintiff's efforts to seek benefits through the

21   March 16, 2010 letters were protected under ERISA.  (Id.)  This Court agrees.  Plaintiff's letter of

22   March 16, 2010 was Plaintiffs' attempt to seek benefits pursuant to one of the plans and is a statutorily

23   protected activity.

24       The Court next addresses whether an adverse employment action was taken against them.  In

25   this case, shortly after their written letters of March 16, 2010, Plaintiffs were informed on April 27,

26   2010 that their last day of work would be June 26, 2010.  An adverse employment action was taken

27   against both Plaintiffs as they were terminated from their employment.

28       The Court must next look at whether there was a causal connection between the March 16,

2010 letters and their subsequent terminations.  In <u>Lessard v. Applied Risk Management</u>, 307 F.3d 1020 (9th Cir. 2002), plaintiffs were beneficiaries under a medical benefit plan and their benefits were terminated following the sale of the employer's assets to a successor.  The sales agreement required that each employee be actively employed on the day of the sale for continued employment in the successor company.  <u>Id.</u> at 1022. At the time of the sale, Plaintiff was on workers' compensation leave under the medical portion of the plan and had not sought employment since her spinal fusion surgery. <u>Id.</u>  The Court concluded that Defendants knew that five employees were on some form of medical leave and that the agreement facially discriminated against employees who were on disability, workers' compensation and any other form of extended leave.  <u>Id.</u> at 1025-26.  "[W]e find that section 510 is violated when an employer selects for presumptive termination and denial of benefits specifically those employees presently on medical or disability leave."  <u>Id.</u> at 1026.  The employer is not permitted to exclude a select group of employees from immediate transfer because they were not at work.  <u>Id.</u>

Defendants argue that the offer of employment and release were for all the employees, not limited to those who sent the letter on March 16, 2010.  In addition, Defendants state that the requirement for releases was adopted by the buyer group before the March 16 letters were received. (Dkt. No. 45-6, Ex. 19 at 5, 10-11.)  The parties filed stipulated joint statement of undisputed fact which states that, "[a]ll persons who signed the release were employed by the post-closing entity, whether or not they had submitted notices or letters of the type submitted by Plaintiffs on or about March 16, 2010.  Plaintiffs Bluhm and Becker would have been offered employment by the post-closing entity had they signed the release."  (Dkt. No. 45-5, Parties' Joint Statement of Undisputed Facts ¶ 7.)

In opposition, Plaintiffs contend that not only did the seven or eight people who sent the letters not receive an offer of employment and release but they were also excluded from a meeting held right after the letters were received where employees were given post-closing employment offers along with releases.  On March 16, 2010, Plaintiffs sent letters concerning severance claims with written notice giving a 10 day opportunity to remedy their loss of pay and job duties. (Dkt. No. 35-3, Ferguson Decl., Exs. 4, 5.)  Plaintiff Bluhm's letter got to Defendants a day later because Federal Express delivered her overnight letter in two days. (Dkt. No. 44-3, Ex. 49 at 221.)  The people who sent the March 16,

2010 letters did not receive offers of employment and release.  Bluhm stated that she did not receive an offer.  (Dkt. No. 44-3, Ex. 49 at 210.)  She also stated that she was not willing to sign the release.  (Id. at 216.)  It was her understanding that the people who sent letters did not receive the release.  (Id. at 221.)  She received the release by mistake because her March 16 letter arrived a day later than everybody else's.  (Id. at 221-22.)  Bluhm was encouraged to sign the release and take the job with the post-closing Red Capital.  (Id. at 224.)  She testified that she was invited to an urgent meeting on March 17th or 18th and that the only six people not invited to that meeting were those who sent the letters.  (Id. at 232-33.)  She stated that she would not have been invited to the meeting had Defendants received her letter a day earlier.  (Id. at 232.)  She did not attend the meeting.  (Id. at 210.)  It was clear that she was not going to get an offer.  (Dkt. No. 44-3, Ex. 49 at 239.)

On March 20, 2010, Bluhm, not Becker, received a "Confirmation of Employment" along with a release of all employment-related claims.  (Dkt. No.35-12, Howard Decl., Ex. A-6 at 21-25.)  Becker did not receive a "Confirmation of Employment although he was aware an offer letter with a release had been sent to people.  (Dkt. No. 35-12, Howard Decl., Ex. B at 27-28.)  Plaintiffs did not sign the release.  (Dkt. No. 35-12, Howard Decl.,  Ex. A at 12, Ex. B at 33.)  Bluhm was terminated on April 27th and told not come into the office any more after that but she was paid until around June 25th.  (Dkt. No. 44-3, Ex. 49 at 237.)  She was offered a standard PNC severance package which she declined.  (Id. at 241.)

Becker heard that the March 16th letters had a chilling effect on the transaction.  (Dkt. No. 44-3, Rezzo Decl., Ex. 50 at 257.)  He did not attend the meeting on March 17th.  (Id. at 261.)  Becker testified that he and others who wrote the March 16, 2010 letters were excluded from the employee meeting announced after receipt of the letters where people were given employment offers or employment confirmations.  (Dkt. No. 44-3, Rezzo Decl., Ex. 50 at 261, 264, 265, 266.)  He never received a release and was not asked to sign it.  (Id. at 258, 262.)

Based on these facts, Plaintiffs have demonstrated a disputed issue of fact as to whether there was a causal connection between the March 16, 2010 letters and their subsequent terminations.  Accordingly, the Court DENIES Defendants' motion for summary judgment.

/ / / /

[11cv313-GPC(RBB)]

**Conclusion**

Based on the above, the Court GRANTS Defendants' motion for summary judgment as to Counts One and Two.  The Court DENIES Defendants' motion for summary as to the retaliation claim under Count Three.

IT IS SO ORDERED.


DATED:  February 1, 2013

HON. GONZALO P. CURIEL
United States District Judge

[11cv313-GPC(RBB)]